[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] STIPULATION OF FACTS
The Plaintiff and the Defendant hereby stipulate that the following facts are true:
1. Robert Ralsey Davenport (the "Plaintiff") is a resident of the State of California.
2. The Society of the Cincinnati in the State of Connecticut (the "Defendant"), a tax-exempt charitable organization, is a hereditary society of lineal and collateral descendants and a Connecticut non-stock corporation specially chartered by 1895 Special Act No. 121 of the General Assembly, as amended by Special Act No. 84-14. A copy of 1895 Special Act No. 121 is attached hereto, made a part hereof and marked "Exhibit A"; a copy of Special Act No. 84-14 is attached hereto, made a part hereof and marked "Exhibit B". CT Page 7707
3. The Defendant operates pursuant to and under its bylaws, a copy of which is attached hereto, made a part hereof and marked "Exhibit C".
4. The Defendant is one of 13 such state societies, one in each of the 13 original states, which, together with a fourteenth society in France, comprise The General Society of the Cincinnati ("The General Society"). The General Society was created by a document entitled "The Institution of the Society of the Cincinnati", which was prepared and accepted by Officers of the American Army in Cantonment on Hudson's River on Tuesday, May 13, 1783, including General George Washington. A copy of The Institution of the Society of the Cincinnati is attached hereto, made a part hereof and marked "Exhibit D".
5. The General Society maintains as its national headquarters a mansion, museum and library, known as Anderson House, in Washington D.C. for the use of its members and their guests, providing accommodations for lodging, socializing and conducting genealogical and historical research. The General Society operates pursuant to and under Exhibit D and the General Society's Bylaws, a copy of which is attached hereto and made a part hereof, and marked "Exhibit E".
6. The membership of the Defendant consists of, and as a general rule is restricted to, males who are lineal descendants of officers who served in the Continental Army or Navy during the Revolutionary War.
7. The Plaintiff was, continuously from 1977 until February 15, 1999, a member in good standing of Defendant, having joined in the right of his ancestor, Lieutenant Hezekiah Davenport.
8. In December 1998, after the Defendant had been advised of certain instances of conduct of the Plaintiff alleged not to be consistent with membership in Defendant, the Defendant commenced a process to determine whether to expel Plaintiff from the Defendant, pursuant to Article 25 of its bylaws, by reason of such conduct. Dr. David Franklin Musto ("Musto"), the President of the Defendant, appointed a committee chaired by David W. Dumas ("Dumas") and composed also of Atwood Collins, II and Jay W. Jackson, all Connecticut attorneys, to inquire into the matter (the "Committee"). CT Page 7708
9. By letter dated December 23, 1998, Dumas, the Chairman of the Committee wrote the Plaintiff a letter, a copy of which is attached hereto, made a part hereof and marked "Exhibit F".
10. Plaintiff responded by letter dated January 7, 1999, a copy of which is attached hereto, made a part hereof, and marked "Exhibit G".
11. By letter dated January 13, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit H", counsel for the Plaintiff wrote to Dumas enclosing the sworn response of the Plaintiff, which in turn enclosed various documents.
12. The Committee, by letter to Musto dated January 14, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit I", recommended that the Plaintiff be expelled from membership in the Defendant for conduct "inconsistent with membership in `One Society of Friends'", on the following grounds:
a. "That you caused to be reprinted Bryce Metcalf'sOriginal Members and Other Officers Eligible to the Society ofthe Cincinnati, 1783-1938, including the copyrighted insigne and name of the Society, without authorization from the Society and indeed over its objections"; and
b. "That you were asked to leave Anderson House by then Vice President George Raiford in April 1997 by reason of your treatment of several members of the staff, and that your use of Anderson House was and remains suspended."
13. By letter dated January 15, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit J", Musto sent a copy of the report of the Committee to the Plaintiff and a copy to his counsel.
14. By letter dated January 19, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit K", counsel for the Plaintiff wrote to Dumas requesting documents.
15. By letter dated January 22, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit L", Dumas responded to Exhibit K, identifying exhibits to be presented at the special meeting of the Defendant which would consider the CT Page 7709 expulsion of the Plaintiff from the Defendant.
16. Pursuant to the call of the President of the Defendant, dated January 25, 1999, mailed only to members of the Defendant, a copy of which is attached hereto, made a part hereof and marked "Exhibit M", a special meeting (the "Special Meeting") of the membership of the Defendant was scheduled to be held at the Quinnipiack Club in New Haven, Connecticut on February 15, 1999 to determine whether to adopt the expulsion recommendation of the Committee.
17. By letter dated January 27, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit N", counsel for the Plaintiff responded to Exhibit L.
18. By letter to counsel for the Plaintiff dated February 5, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit O", Dumas responded to Exhibit N.
19. In addition, as noted in Exhibit O, the staff of Anderson House was instructed by the President of the General Society not to speak with the Plaintiff or his attorney in advance of the Special Meeting.
20. By letter dated February 8, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit P", counsel for the Plaintiff wrote to Dumas enclosing two documents which ultimately were placed in the packet hereinafter marked "Exhibit T."
21. By letter dated February 10, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit Q", counsel for the plaintiff wrote to Dumas enclosing another document which ultimately was placed in the packet hereinafter marked "Exhibit I"
22. The Special Meeting was held as and where scheduled on February 15, 1999. A certified verbatim transcript of the Special Meeting, prepared by a court reporter who was in attendance, is attached hereto, made a part hereof and marked "Exhibit R". (A corrected copy, approved by counsel for both parties, is also attached as Exhibit R-1).
23. A copy of the agenda for the Special Meeting is attached hereto, made a part hereof and marked "Exhibit S". CT Page 7710
24. Each member of the Defendant in attendance at the Special Meeting received a packet of documents, a copy of which is attached hereto, made a part hereof and marked "Exhibit T", and a copy of a letter from the Plaintiff; dated February 10, 1999, a copy of which is attached hereto, made a part hereof and marked "Exhibit U", which the Plaintiff read into the record (Exhibit R) during the course of the Special Meeting.
25. The Defendant established procedural rules for the Special Meeting which are set forth at page 7 of Exhibit R and in Exhibit O.
26. The Special Meeting was conducted in accordance with the procedural rules, although the Plaintiff was allowed to complete reading his response when the 20 minute limit expired. Defendant also stated that the meeting was being conducted under Robert's Rules of Order.
27. After the presentation and questions concluded, Musto allowed the Plaintiff to cast a vote against his own expulsion and then required him and his counsel to leave the room while the remaining 17 members in attendance discussed the matter behind closed doors and voted by secret written ballot, which was explained to Plaintiff to be in accordance with the applicable provisions of Robert's Rules of Order.
28. The 17 members attending the Special Meeting, other than the Plaintiff, voted unanimously to expel the Plaintiff.
29. Immediately following the adjournment of the Special Meeting, a member of the Committee orally informed the Plaintiff that the only publication of the action of the Special Meeting would state that the Plaintiff was no longer a member of the Defendant as of February 15, 1999, and that his expulsion and the facts attendant thereto would not be publicized.
30. By letter dated February 18, 1999 Mr. Dumas sent counsel for plaintiff a letter defendant's Secretary had written to the Secretary of the General Society dated February 16, 1999 which together are attached hereto, made a part hereof and marked "Exhibit V".
31. The loss of the Plaintiffs membership in the Defendant by expulsion leaves a vacancy which can be filled by another CT Page 7711 descendant claiming eligibility in the right of Lieutenant Hezekiah Davenport. If the vacancy is filled, the Plaintiff would be excluded permanently from membership in the Defendant.
32. Defendant is unable to determine whether any member other than the Plaintiff has ever been expelled from the Defendant.
PLAINTIFF ROBERT RALSEY DAVENPORT By: Jonathan J. Klein 1445 Capitol Avenue Bridgeport, CT 06604 Juris No. 305638 Tel.: (203) 330-1900 Fax.: (203) 330-1526 — His Attorney —
DEFENDANT
THE SOCIETY OF THE CINCINNATI IN THE STATE OF CONNECTICUT By: Ralph G. Elliot Tyler Cooper Alcorn, LLP City Place-35th Floor Hartford, CT 06103-3488 Juris No. 00362 Tel.: (860) 725-6200 Fax.: (860) 278-3802 — Its Attorney —
 ATTACHMENT 2 The Institution of the Society of the Cincinnati
"It having pleased the Supreme Governor of the Universe, in the disposition of human affairs, to cause the separation of the colonies of North America from the domination of Great Britain, and, after a bloody conflict of eight years, to establish them free, independent and sovereign States, connected, by alliances founded on reciprocal advantage, with some of the great princes and powers of the earth.
"To perpetuate, therefore, as well the remembrance of this vast event, as the mutual friendships which have been formed under the pressure of common danger, and, in many instances, CT Page 7712 cemented by the blood of the parties, the officers of the American Army do hereby, in the most solemn manner, associate, constitute and combine themselves into one SOCIETY OF FRIENDS, to endure as long as they shall endure, or any of their eldest male posterity, and, in failure thereof, the collateral branches who may be judged worthy of becoming its supporters and Members.
"The officers of the American Army having generally been taken from the citizens of America, possess high veneration for the character of that illustrious Roman, Lucius Quintus Cincinnatus; and being resolved to follow his example, by returning to their citizenship, they think they may with propriety denominate themselves —
 The Society of the Cincinnati "The following principles shall be immutable and form thebasis of the Society of the Cincinnati:
"AN INCESSANT ATTENTION TO PRESERVE INVIOLATE THOSE EXALTED RIGHTS AND LIBERTIES OF HUMAN NATURE, FOR WHICH THEY HAVE FOUGHT AND BLED, AND WITHOUT WHICH THE HIGH RANK OF A RATIONAL BEING IS A CURSE INSTEAD OF A BLESSING.
"AN UNALTERABLE DETERMINATION TO PROMOTE AND CHERISH, BETWEEN THE RESPECTIVE STATES, THAT UNION AND NATIONAL HONOR SO ESSENTIALLY NECESSARY TO THEIR HAPPINESS, AND THE FUTURE DIGNITY OF THE AMERICAN EMPIRE.
"TO RENDER PERMANENT THE CORDIAL AFFECTION SUBSISTING AMONG THE OFFICERS. THIS SPIRIT WILL DICTATE BROTHERLY KINDNESS IN ALL THINGS, AND PARTICULARLY, EXTEND TO THE MOST SUBSTANTIAL ACTS OF BENEFICENCE, ACCORDING TO THE ABILITY OF THE SOCIETY, TOWARDS THOSE OFFICERS AND THEIR FAMILIES. WHO UNFORTUNATELY MAY BE UNDER THE NECESSITY OF RECEIVING IT.
"The General Society will, for the sake of frequent communications, be divided into State Societies, and these again into such districts as shall be directed by the State Society.
"The Societies of the districts to meet as often as shall be agreed upon by the State Society, those of the State on the fourth day of July annually, or oftener, if they shall find it expedient, and the General Society on the first Monday in May, annually, so long as they shall deem it necessary, and CT Page 7713 afterwards, at least once in every three years.
"At each meeting, the principles of the Institution will be fully considered, and the best measures to promote them adopted.
"The State Societies will consist of all the members resident in each State respectively; and any member removing from one State to another, is to be considered, in all respects, as belonging to the Society of the State in which he shall actually reside.
"The State Societies to have a President, Vice-President, Secretary, Treasurer, and Assistant Treasurer, to be chosen annually, by a majority of votes, at the State meeting.
"Each State meeting shall write annually, or oftener, if necessary, a circular letter, to the State Societies, noting whatever they may think worthy of observation, respecting the good of the Society, or the general union of the States, and giving information of the officers chosen for the current year: copies of these letters shall be regularly transmitted to the Secretary-General of the Society, who will record them in a book to be assigned for that purpose.
"The State Society will regulate everything respecting itself and the Societies of its districts consistent with the general maxims of the Cincinnati, judge of the qualifications of the members who may be proposed, and expel any member who, by a conduct inconsistent with a gentleman and a man of honor, or by an opposition to the interest of the community in general, or the Society in particular, may render himself unworthy to continue a member.
"In order to form funds which may be respectable, and assit the unfortunate, each officer shall deliver to the Treasurer of the State Society one month's pay, which shall remain for ever to the use of the State Society; the interest only of which, if necessary, to be appropriated to the relief of the unfortunate.
"Donations may be made by persons not of the Society, and by members of the Society, for the express purpose of forming permanent funds for the use of the State Society, and the interest of these donations appropriated in the same manner as that of the month's pay. CT Page 7714
"Moneys, at the pleasure of each member, may be subscribed in the Societies of the districts, or the State Societies, for the relief of the unfortunate members, or their widows and orphans, to be appropriated by the State Society only.
"The meeting of the General Society shall consist of its officers and a representation from each State Society, in number not exceeding five, whose expenses shall be borne by their respective State Societies.
"In the general meeting, the President, Vice-President, Secretary, Assistant Secretary, Treasurer, and Assistant Treasurer-Generals, shall be chosen, to serve until the next meeting.
"The circular letters which have been written by the respective State Societies to each other, and their particular laws, shall be read and considered, and all measures concerted which may conduce to the general intendment of the Society.
"It is probable that some persons may make donations to the General Society, for the purpose of establishing funds for the further comfort of the unfortunate, in which case, such donations must be placed in the hands of the Treasurer-General, the interests only of which to be disposed of, if necessary, by the general meeting.
"All the officers of the American army, as well as those who have resigned with honor, after three years' service in the capacity of officers, or who have been deranged by the resolution of Congress upon the several reforms of the army, as those who shall have continued to the end of the war, have the right to become parties to this institution; provided that they subscribe one month's pay, and sign their names to the general rules, in their respective State Societies, those who are present with the Army immediately; and others within six months after the Army shall be disbanded, extraordinary cases excepted; the rank, time of service, resolution of Congress by which any have been deranged, and place of residence must be added to each name — and as a testimony of affection to the memory and the offsping of such officers as have died in the service, their eldest male branches shall have the same right of becoming members, as the children of the actual members of the Society.
"Those officers who are foreigners, not resident in any of CT Page 7715 the States, will have their names enrolled by the Secretary-General, and are to be considered as members in the Societies of any of the States in which they may happen to be.
"And as there are, and will at all times be, men in the respective States eminent for their abilities and patriotism, whose views may be directed to the same laudable objects with those of the Cincinnati, it shall be a rule to admit such characters, as Honorary Members of the Society, for their own lives only: Provided always, That the number of Honorary Members, in each State, does not exceed a ration of one to four of the officers or their descendants.
"Each State Society shall obtain a list of its members, and at the first annual meeting, the State Secretary shall have engrossed, on parchment, two copies of the Institution of the Society, which every member present shall sign, and the Secretary shall endeavor to procure the signature of every absent member; one of those lists to be transmitted to the Secretary-General, to be kept in the archives of the Society, and the other to remain in the hands of the State Secretary. From the State lists, the Secretary-General must make out, at the first general meeting, a complete list of the whole Society, with a copy of which he will furnish each State Society.
"The Society shall have an Order, by which its members shall be known and distinguished, which shall be a medal of gold, of a proper size to receive the emblems, and suspended by a deep blue riband two inches wide, edged with white, descriptive of the union of France and America, viz.:
 "The principal figure. Cincinnatus: Three Senators presenting him with a sword and other military ensigns — on a field in the background, his wife standing at the door of their Cottage — near it. A PLOUGH AND INSTRUMENTS OF HUSBANDRY. Round the whole, OMNIA RELINQUIT SER VARE REMPUBLICAM. On the reverse, CT Page 7716 Sun rising — a city with open gates, and vessels entering the port — Fame crowning CINCINNATUS with a wreath, inscribed VIRTUTIS PRAEMIUM. Below, HANDS JOINED. SUPPORTING A HEART With the motto, ESTO PERPETUA. Round the whole, SOCIETAS CINCINNATORUM INSTITUTA. A, D, 1783."
Excerpt from the minutes of the triennial meeting of the General Society, held in the City of Baltimore on May 18, 1854:
 Resolved. That each State Society shall have the full right and power to regulate the admission of members, both as to qualifications of members and the terms of admission. Provided, that the admission be confined to the male descendants of original members (including collateral branches as contemplated by the original Constitution), or to the male descendants of such officers of the Army and Navy as may have been entitled to admission, but who failed to avail themselves thereof within the time limited by the Constitution; or to the male descendants of such officers of the Army and Navy of the Revolution as may have resigned with honor, or left the service with reputation, or to the male collateral relative of any officer who died in service without leaving issue.
 ATTACHMENT 3 ROBERT R. DAVENPORT Founding President, Southern California Chapter of the Society of the Cincinnati
 E-mail: Davenport@post.Harvard.edu 564 Midvale Avenue #8 Los Angeles CA 90024 Phone (310) 208-2603 Fax (310) 208-7434
 February 10th, 1999 CT Page 7717
Dear Gentlemen:
I applied to become a member of the Society of the Cincinnati in the State of Connecticut 22 years ago, when I was serving on active duty with the United States Navy after correspondence with Percy Goodsell, who recommended that I join in the right of Lieutenant Hezekiah Davenport.
It is indeed ironic that this meeting is being held within the bounds of the former New Haven Colony, since this colony was founded by the Rev. John Davenport and Theophilus Eaton. Eaton was the business leader of the colony, and the Rev. John Davenport was the religious leader, and they came here to found a colony based on the Rev. John Davenport's theory of a secular government based upon the Bible. Later, the Rev. John Davenport's grandson, also named the Rev. John Davenport, convinced Eaton's grandson, Elihu Yale, that if he would endow his college, he would name it in his honor. As many of you know, it is now called Davenport College at Yale University.
I joined this society while serving as the commander of Combat Aircrew Eight, Patrol Squadron 44. As a former naval aviator, I am entitled to wear the gold wings of a Naval Flight Officer. I felt that as a military officer, I was continuing the tradition of the society of the Cincinnati, an organization founded by military officers. Subsequently, I applied for membership for my father, CDR Harry Augustus Davenport III, USCG (Ret.), a distinguished gentleman who was first in his class at the Coast Guard Academy, graduated from Harvard Law School, and who, like myself, is also very interested in history. He joined in the right of Major James Davenport, an original member of the society. Many other members of my family are members of the Cincinnati in other state societies, such as Byrd Warwick Davenport in Virginia, Huntley Gibson Davenport in Pennsylvania, and Michael John Davenport in New York, and of course I am distantly related to virtually every member of the v Connecticut Society, including James Stephen Lord in the Connecticut Society, who represents Major John Davenport, an Original Member. In fact, it was his grandfather, John Sidney Davenport III, who proposed me for membership.
Following my active duty time in the Navy, I entered law school, and was subsequently admitted to both the New York and California state bars, both on first examination. I was then selected, under the Attorney General's Honor Law Graduate CT Page 7718 Program, which selects ten attorneys each year from over 10,000 applicants, to work at the US Department of Justice in Washington DC.
I then entered Harvard Business School, where I obtained my Master of Business Administration, and then moved to Los Angeles, California, where I became an executive in the motion picture business. I left that to enter film school, where I obtained my Master of Fine Arts in Screenwriting, and have been engaged as a writer since then.
In addition to winning over twelve screenwriting awards, I am the author of a number of books. My most recent, Roots of theRich and Famous, deals with the ancestry of Hollywood personalities, and has resulted in my gaining nationwide celebrity status. I am known as the "Genealogist to the Stars," I've appeared on television and radio, and I am the most well known genealogist in the world.
I am also well known within the lineage society community, as the founder, editor, and publisher of the Hereditary Society BlueBook, which has just recently come out in its seventh edition. This book is the bible of the hereditary society community.
As many of you probably know, I have also been very active within the Society of the Cincinnati. I am the founder of the Southern California Chapter of the Society of the Cincinnati, and its first president. I am also responsible for the creation of Society of the Cincinnati Day in the city of Los Angeles.
Upon the breaking out of the Gulf War, I enlisted in the United States Army, and on the basis of my rank as a Lieutenant in the United States Navy, I was appointed a Captain in the Judge Advocate General Corps. I have since been promoted to Major. During my time in the army, I completed Command and General Staff College.
In addition, I have received a number of awards, including the Defense Meritorious Service Medal, the Meritorious Service Medal, the Army Commendation Medal, the Joint Service Achievement Medal, the Army Achievement Medal, and the Humanitarian Service Medal, as well as numerous other awards. I am extremely proud of my service record.
As a result of my service, I have joined many veterans CT Page 7719 groups. Among others, I am a life member of Disabled American Veterans, and a life member of Veterans of Foreign Wars.
As many of you know, last summer the Connecticut Society of the Cincinnati charged me with lying about my military service. After having this military service listed in the society's directory for over 20 years, they suddenly came to the conclusion that I had not been in the military. I was never told who made this accusation, nor was I ever supplied with any documents which supplied the basis for such an accusation. I was required to submit to the society dozens of documents to verify my service, which I did. After this complete investigation of my background, the society came to the conclusion that I was indeed a Lieutenant in the United States Navy, and that I indeed was a Major in the United States Army. Even after the conclusion of this investigation, I was never told who called my military service record into question.
I believe the society would be better served, if they wish to investigate members, to concentrate on those members who have been raising all of these false charges. They include a person who paid his fee to the society of the Cincinnati while he was in bankruptcy, hiding the money from the United States federal bankruptcy court, a person with a prior criminal record, a person who wears the Distinguished Service Cross, even though he is not entitled to it, drug dealers, and persons who have accused of everything from embezzlement to grand larceny. Members of their gang have even been sent to prison as the result of conviction of felonies. Are these the types of members you want in the Society of the Cincinnati?
My service to the hereditary society community has made me the target of these nefarious individuals, who unfortunately have infiltrated the hereditary society community. Their criminal activity in various societies, and their wholesale theft of funds, has necessitated their removal from the Hereditary Society Blue Book. In response to this action, they have resolved to destroy myself, and the book, and to establish their own publication. These facts are well known to many members of the lineage society community, and their activities are currently the subject of a specially appointed investigator by another lineage society. They are also currently under surveillance by the Federal Bureau of Investigation for a wide variety of crimes.
This expulsion action is but the latest chapter in a history CT Page 7720 of persecution which they have waged against me in the past five years. Many persons are aware of their latest move, in which they filed a false police report with the Glendale Police Department, which resulted in my arrest, booking, and indictment on criminal trespass charges in Los Angeles. When the true facts of that incident became known to the district attorney, the charges were dismissed.
The number of actions which they have taken against me could fill a book. They include:
1 They filed false charges with the California State Bar, in an attempt to have me disbarred, and to have my license to practice law in California revoked. I was required to appear before the state bar committee, very much like I have had to appear before this body. As a result, all of the false charges were dismissed.
2 They tried to get me thrown out of the Army, by a concerted campaign of letters, all of them libelous, to various government officials. These included letters to the Secretary of Defense, the Chief, Army Reserve, and the Judge Advocate General of the Army. As a result of these letters, I was investigated by the Army Inspector General, and was forced to fly to Washington and appear before the Chief, Army Reserve. As a result of this hearing, all charges against me were proved false, all charges were dropped, and my military service record was cleared of all derogatory information.
3 One of these nefarious individuals published a history of the Aztec Club, another organization to which I belong. In this history of over one thousand pages, he declares that it contains the names of every person who has joined the club since its founding in 1847. In truth, it contains the name of every single person who has ever been a member, except myself. His omission of my name from this history was vicious, libelous, and totally unworthy of a gentleman.
4 As I mentioned above, this gang had me arrested for criminal trespass, by filing a false report with the Glendale Police Department. I was arrested, indicted, and forced to obtain an attorney to defend me on these totally false charges. Each and every member of this gang came to each and every hearing in this matter, in an attempt to influence the court. They also held clandestine meetings with the district attorney, in which CT Page 7721 they tried to use political influence to prevent the dismissal of the charges. Despite all of their attempts at tampering with the judicial process, however, the charges were dismissed.
5 Because their campaign of terrorism knows no bounds, they have come onto my property, and vandalized both my house and my car. They have then boasted to their friends of these acts. One such action consisted of an attack on my personal automobile. They sneaked onto my property, and filled each and every lock, including the trunk, with super-glue. I was required to have all of the locks on the car changed, at great personal expense. The only way I was able to stop these attacks, was to put metal security bars on all of the windows, to install television monitors, and to inform them that I had done so. Knowing that further attacks would be filmed, they have discontinued their personal attacks on my home.
6 In a further attempt to humiliate and terrorize me, they convinced the Internal Revenue Service that I was concealing income, which led to a thorough IRS investigation of all of my bank records. At my expense, they ordered copies of every single bank account of mine for the past ten years, and required me to appear at a number of audits. The only upshot of these audits, however, was an income tax refund, when the auditor realized that I had not taken a charitable deduction.
7 Having discovered that the IRS can be a powerful way to harass an individual, they then tried to instigate a similar investigation of the Historic Trust, an organization of which I am President, and which is a charitable, educational, and literary organization which, among other good works, publishes the Hereditary Society Blue Book, and which also published the Metcalf book. Despite their attempts, the IRS found nothing incorrect in the accounts of the Historic Trust.
8 As many people within the hereditary society community know, they have tried by constant mailings to destroy the Hereditary Society Blue Book, which has finally forced me in the most recent edition to discontinue the listing of the address of those listed in the book. These mailings have contained libelous material, and have to mailed to virtually every person listed in the book. However, despite a three year barrage of mailings, the Blue Book has gone through three more editions. This proves that the hereditary society community supports myself, and has nothing but contempt for these persons. CT Page 7722
9 Another action which they have taken against me was instigating an investigation of myself by the Senate Committee on Veterans Affairs. Using the fact that I had won, on my own behalf, a landmark case in the Court of Veterans Appeals, Davenport v. Brown, they convinced this Senate subcommittee that I was not entitled to the disability pension that I receive from the Veterans Administration. After Senate hearings, however, it was determined that these charges were false, and that I was indeed entitled to my full disability benefits.
As you can see from this partial rendition of these episodes, this expulsion hearing within the Society of the Cincinnati is just another attempt by this faction to discredit me. They have used their usual tools of false allegations, brought in a forum in which I am forced to defend myself, and with the help of persons they know to be friendly to their cause. I am sure that this group will come to the same conclusion as all of these other organizations and government bodies, that these charges are totally unfounded.
As regards the alleged incident at Anderson House, this never occurred. I have personally called Charles Kolb, the head of the committee of the General Society which has oversight of Anderson House, and his committee has never heard of me. I have not been discussed at their meetings, they are unaware that the President General has banned me from Anderson House. When you combine this with the well known fact that Raiford never made mention of this alleged incident during his tenure as Vice President, that he is a well known to be a friend of these conspirators, and that he has instructed the entire Anderson House staff to refuse to talk to my attorney, you will realize that this entire alleged incident has been fabricated.
As regards the Metcalf book, it is well known that many persons within the society have wanted this republished, including the history committee of the General Society. This reprinting was a service to the society, and which has still not recouped its cost, being several thousand dollars in the red. A letter from the President General, asking me not to republish it, was sent to the wrong address, and I never received it. In fact, the address was not even on my carriers mail route. This all occurred six or seven years ago. Four years ago, the Standing Committee of the General Society considered this matter, and now consider it closed. As I understand from a letter of Mr. Peter CT Page 7723 North, the Connecticut Society itself considered this matter at a Standing Committee meeting three years ago. One would expect that some sort of self-imposed statute of limitations would attach to such matters, to prevent this remaining a topic of consideration well into the next millenium.
I would urge this society to put an end to their involvement in this campaign of libel, slander, and character assassination at this very meeting, by refusing to vote to expel me from the society. Any other course of action will only serve to further embroil the Society of the Cincinnati in these scurrilous matters.
Sincerely,
ROBERT R. DAVENPORT
CT Page 7707